UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x

WAVERLY PROPERTIES, LLC,                        :

                Plaintiff,        :

      -against-                             :

KMG WAVERLY, LLC, et al.,                       :

           Defendants.       :

----------------------------------------------------------x

| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED:  8/15/11 |

**REPORT AND
RECOMMENDATION
TO THE HONORABLE
VICTOR MARRERO**

09 Civ. 3940 (VM) (FM)

**FRANK MAAS,** United States Magistrate Judge.

        This diversity action arises out of the purchase of three luxury residential

condominium units by Plaintiff Waverly Properties, LLC ("Waverly") from Defendant

KMG Waverly, LLC ("KMG" or "Sponsor"), in April 2006. In its 38-page complaint,

Waverly pleads nine causes of action against KMG and several other entities and

individuals involved in the development, promotion, and construction of the

condominium units (collectively, the "Defendants"). In those causes of action, Waverly

pleads the following claims: (i) breach of contract (three counts), (ii) negligence, (iii)

fraudulent and/or negligent misrepresentation (three counts), (iv) gross negligence, and

(v) violation of Section 349 ("Section 349") of the New York General Business Law

("GBL"), New York State's consumer fraud statute. Waverly seeks unspecified money

damages, rescission of the three contracts pursuant to which it purchased the units

("Purchase Agreements"), and return of the deposit or purchase price paid for each unit.

Certain of the Defendants, in turn, have asserted a counterclaim against Waverly for breach of contract, pursuant to which they seek to recover $2 million (plus interest) as liquidated damages, and the fees, costs, and expenses incurred in litigating this case.  (ECF No. 43).

Following the close of discovery, the Defendants have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (ECF No. 116).  They seek the dismissal of all of Waverly's claims and an award of judgment in their favor on their counterclaim.  (Id.).  For the reasons set forth below, the Defendants' motion should be granted in part and denied in part.

I.    Background

Unless otherwise noted, the following facts are either undisputed or set forth in the light most favorable to Waverly.[1]

A.    Parties

Waverly is a Nevada limited liability company.  (Pl.'s Resp. to Defs.' Stmt. of Undisputed Material Facts Pursuant to Local Civil Rule 56.1 (ECF No. 125) ("Pl.'s 56.1 Counter-Stmt.") ¶ 8).  James Clark ("Clark"), Waverly's principal, formed Waverly for the purpose of acquiring title to three units in the 147 Waverly Place Condominium ("Building"), located at 147 Waverly Place in Greenwich Village.  (Id. ¶¶ 2, 6; Decl. of Peter A. Sullivan, Esq., dated Apr. 11, 2011 (ECF No. 126) ("Sullivan Decl."), Ex. 29

---

[1]      When only one party's Rule 56.1 Statement is cited, the other party's Rule 56.1 counterstatement either does not dispute the fact alleged or fails to cite admissible evidence supporting its position.

("Clark Dep.") at 48-49).  The Defendants describe Clark as a "titan of business."  (Defs.'

Stmt. of Undisputed Material Facts Pursuant to Local Civil Rule 56.1 (ECF No. 119)

("Defs.' 56.1 Stmt.") ¶ 9).  Indeed, Clark is the founder of several successful companies,

including Netscape, WebMD, Shutterfly, and MyCFO.  (Clark Dep. 4-7).

      KMG is a New York limited liability company with its principal place of

business in New York City.  (Pl.'s 56.1 Counter-Stmt. ¶ 1).  KMG was the sponsor of a

public offering for the sale of units in the Building.  (Id. ¶ 2).

B.    <u>Plan</u>

      The public offering of the Building's units was made pursuant to an

offering plan ("Plan").  (Id.).  The Plan "set[s] forth in detail all material facts relating to

the [public] offering by Sponsor" and "contains all of the detailed terms of the

transaction." (Sullivan Decl. Ex. 1 (Plan) at 7).  The Plan was filed with the New York

State Attorney General's Office on February 21, 2006.  (Pl.'s 56.1 Counter-Stmt. ¶ 3).  At

that time, construction on the Building had not yet begun.  (See id. ¶ 7).

1.    <u>KMG's Obligations</u>

      KMG's duties under the Plan are generally described in the section of the

Plan entitled "Rights and Obligations of Sponsor."  (See Plan at 80-87).  Pursuant to that

section, KMG is required to "complete the construction of the Building with a quality of

construction comparable to the currently prevailing local standards and substantially in

accordance with the Plans and Specifications for the construction work filed with the

Buildings Department and other appropriate government authorities."[2]  (Id. at 80).  The Plan further provides that the Building "will conform to all applicable regulations of the Building Code of the City of New York ('Building Code')."  (Id. at 127).

   The Plan also contains a limited warranty clause ("Limited Warranty"), which precludes a purchaser's reliance on "Article 36-B of the [GBL] ('Housing Merchant Implied Warranty')."  (Id. at 82).  Instead, after expressly disclaiming any "other warranties express or implied," KMG agreed that it would "correct, repair, or replace any and all defects relating to construction of the Building, . . . or the Units," subject to a number of restrictions, including a requirement that KMG be given notice of any alleged patent defect within three months and of any alleged latent defect within six months of the date the purchaser acquired title to the unit.[3]  (Id.).

   In addition to the Limited Warranty, the Plan includes a limitation-on-remedies provision, which narrows the relief available to a purchaser seeking to remedy a construction defect.  That provision, which precludes an award of money damages, states that:

> NOTHING CONTAINED IN THIS SECTION WILL BE CONSTRUED SO AS TO RENDER SPONSOR LIABLE FOR MONEY DAMAGES (WHETHER BASED ON NEGLIGENCE, BREACH OF CONTRACT, BREACH OF WARRANTY, OR OTHERWISE), IT BEING INTENDED

---

[2]  The term "Buildings Department" is defined in the Plan as "the Department of Buildings of the City of New York or any successor agency."  (Id. at 12).

[3]  The Plan described "latent" construction defects are those that "are not visually ascertainable."  (Id. at 82).

THAT SPONSOR'S SOLE OBLIGATION UNDER THE
PLAN WILL BE TO REPAIR OR REPLACE ANY
DEFECTIVE ITEM OF CONSTRUCTION UPON, AND
SUBJECT TO, THE TERMS AND CONDITIONS SET
FORTH ABOVE.

(Id. at 84) (block capitalization in original).

2.    Closing Title

The Plan lists nine events that must occur before the sponsor may require

the closing of title to any of the Building's units.  Two of these preconditions are the

issuance of at least a temporary certificate of occupancy ("TCO")[4] for the unit by the

Buildings Department, and the delivery of a bargain and sale deed to the purchaser.  (Id.

at 71).

The Plan also requires that the purchaser "inspect the Unit prior to the

Closing Date and . . . execute at such time an Inspection Statement acknowledging the

Purchaser's acceptance of the Unit in good condition and in accordance with the terms of

the Plan."  (Id. at 82).  If that inspection reveals that the

> Sponsor's improvements as described in the Plan . . . have not
> been fully completed, although such improvements have been
> substantially completed, then Sponsor . . . and Purchaser will
> at the time of such execution agree upon and set forth in the

---

[4]    New York's Multiple Dwelling Law gives the Buildings Department the authority
to issue a TCO "provided that such certificate shall bear the endorsement that the dwelling has
been inspected by the department and complies with all the requirements of this chapter, and that
such temporary occupancy will not jeopardize life, health or property."  N.Y. Mult. Dwell. L.
§ 301(4).  A TCO represents the Buildings Department's determination that "the premises
described [t]herein conforms substantially to the approved plans and specifications and to the
requirements of all applicable laws, rules and regulations for the uses and occupancies
specified."  (See Sullivan Decl. Exs. 42, 48).

> Inspection Statement a list of the incomplete work to be
> completed by Sponsor following the Closing.

(Id.) (emphasis added).  The Plan does not define the term "substantially completed."

(See id. at 12-16).  Moreover, the Plan expressly states that KMG's failure to complete

the work identified in the Inspection Statement "shall not be a ground for Purchaser to

delay the closing."  (Id. at 82).

### 3.   Special Risks

The Plan includes a section regarding "Special Risks."  (Id. at 1).  This

section cautions prospective purchasers "that for a significant period of time following the

First Closing of a Unit through, including and beyond the closing of title to any particular

Purchaser's Unit, work should be expected to be undertaken and performed . . . to

complete construction of the Building."  (Id. at 3).  Although certain noninclusive

examples provided in the Plan relate to common elements of the Building, this section

also states:

> It is anticipated that during the first 5 years of Condominium
> operation, construction workers and related personnel will be
> at the Building from time to time, completing construction of
> the Building, making adjustments and corrections and
> performing various tasks relating to the completion of
> construction.  During this period various building systems,
> including but not limited to water supply, air conditioning,
> heating, cooling, ventilating and elevators, may require
> substantial time after any Closing to complete.

(Id. at 5-6).

6

C.    Purchase Agreements

On April 24, 2006, the parties executed Purchase Agreements, pursuant to which Waverly agreed to buy two units comprising the entire 6th floor of the Building ("6th Floor Units"), as well as the Building's penthouse unit ("Penthouse"), for a total price of $15.4 million.  (Pl.'s 56.1 Counter-Stmt. ¶ 7; Sullivan Decl. Ex. 2).  In accordance with the Plan and Purchase Agreements, Waverly paid an initial deposit of ten percent of the purchase price for each unit that day, which amounted to a total of $540,000 for the two 6th Floor Units and $1 million for the Penthouse.  (Sullivan Decl. Ex. 2 at 1744, 1769, 2272; Plan at 59).[5]

Apart from the specific references to sales prices and deposit schedules, the Purchase Agreements contain identical terms.  (See Sullivan Decl. Ex. 2).  Each of the Purchase Agreements thus incorporates the Plan by reference, giving the Plan "the same force and effect as if set forth at length" therein.  (Id. at 1743, 1768, 2271).  Each of the Purchase Agreements also provides that "[i]n the event of any inconsistency between the provisions of this Agreement and the Plan, the provisions of the Plan will govern and be binding."  (Id.).

Several provisions of the Purchase Agreements either mirror or refer to the text of the Plan.  (See, e.g., id. at 1750, 1175, 2278 ("The construction of the Building and the Unit . . . shall be substantially in accordance with the Plan and the Plans and Specifications . . . [Additionally, t]he closing of title shall occur only after, or

---

[5]     Citations to the Purchase Agreements refer to Waverly's "Bates" numbers.

7

concurrently with, compliance with the prerequisites set forth . . . in . . . the Plan.")).  The Purchase Agreements further provide with respect to the closing process that, "if all other prerequisites not involving the construction of the Unit are met, Purchaser shall be obligated to close and complete payment of the full Purchase Price . . . once a temporary or permanent certificate of occupancy is issued for the Unit."  (Id.).  Although the Purchase Agreements state that "the issuance of a final certificate of occupancy for the Building shall be deemed presumptive evidence that the Building and the Unit have been fully completed in accordance with the Plan and the Plans and Specifications," (id.), there is no similar presumption of "substantial completion" based upon the mere issuance of a TCO.

The Purchase Agreements also each provide that "**TIME IS OF THE ESSENCE**" with respect to the purchaser's obligations to pay any amount owed when due.  (Id. at 1749, 1774, 2277) (block capitalization and emphasis in original).  Each Purchase Agreement further identifies certain "Events of Default," including the purchaser's failure to pay the balance of the full purchase price at the time that such payment is "required to be paid by Purchaser as set forth in the Plan or in this Agreement."  (Id. at 1748, 1773, 2276).  Upon the occurrence of an "Event of Default," each Purchase Agreement gives KMG the right to cancel the Agreement (or seek specific performance) if, within thirty days of receiving a notice of cancellation, the purchaser has failed to cure the specific default.  (Id. at 1749, 1774, 2277).  If the Agreement is canceled, KMG has the right to retain as liquidated damages the deposit paid for the unit,

8

as well as any interest accrued thereon, and may sell the unit "to another as though th[e] Agreement has never been made."  (Id.).  The purchaser also is obligated under each Purchase Agreement to reimburse KMG for "any legal fees and disbursements incurred . . . in defending [its] rights under [the] Agreement or in the event Purchaser defaults under [the] Agreement . . . , in canceling [the] Agreement or otherwise enforcing Purchaser's obligations [t]hereunder."  (Id. at 1754, 1779, 2282).

D.  6th Floor Units

On June 5, 2008, Waverly closed title to the 6th Floor Units, paying the balance of the $5.4 million purchase price for both units.  (Pl.'s 56.1 Counter-Stmt. ¶ 25). Although Waverly had signed Inspection Statements for the 6th Floor Units in May 2008, acknowledging that they generally were "in good condition," (Sullivan Decl. Ex. 66), shortly after the closing Waverly became aware of problems throughout the building regarding the heating, ventilation, and air conditioning ("HVAC") systems.  (Pl.'s Local Rule 56.1 Stmt. of Add'l Material Facts (ECF No. 125) ("Pl.'s 56.1 Stmt.") ¶¶ 26, 27-29). In particular, the air conditioning system in Unit 6W was not generating sufficient cool air, and, worse yet, was creating a water leak.  (Id. ¶¶ 26, 30).

In early July, KMG performed work on the HVAC units and sheetrock in Unit 6W.  (Id. ¶ 31).  Later that month, however, Waverly informed KMG that, despite the repair work, the HVAC systems in both 6th Floor Units still were not functioning properly.  (Id. ¶ 34).  Although KMG assured Waverly at that time that "all HVAC issues have been resolved, which should assuage your concerns regarding the [P]enthouse," new

water stains were found in one of the bedrooms of Unit 6W in August 2008.  (Id. ¶¶ 36, 40).  After this last complaint, KMG forwarded to Waverly an email that KMG had received from its general contractor on August 4, 2008.  In that email, the contractor explained the cause of the leaks in 6W and stated that "all work necessary to rectify this mechanical equipment issue was completed."  (Id. ¶¶ 39, 42).  The temperature control problems in the 6th Floor Units nevertheless persisted until October 2008.  (Id. ¶ 45). Indeed, as late as August 2009, after KMG made additional efforts to repair the HVAC system throughout the entire Building, KMG "continue[d] to struggle on a number of HVAC issues."  (Id. ¶ 81(b)).[6]

HVAC problems were not the only defects in the 6th Floor Units about which Waverly has complained.  In its Complaint, Waverly spells out a laundry list of serious fire safety defects alleged to be present in these units, such as missing fireproofing and improperly placed sprinkler heads.  (ECF No. 1 ("Compl.") ¶¶ 98-102; see also Pl.'s 56.1 Stmt. ¶ 47 (identifying Building Code and other violations)).  Waverly concedes, however, that these non-HVAC related defects were discovered by experts retained in connection with this litigation who first inspected the units in 2009.  (See Compl. ¶ 102; Pl.'s 56.1 Stmt. ¶ 47; Sullivan Decl. Ex. 30 (expert report of Robert Proffitt) ¶ 38, Ex. 31 (expert report of Daniel Tinney ("Tinney")) ¶ 15, Ex. 34 (deposition of expert Michael Zenreich) at 48-49, Ex. 36 (deposition of expert Gregg Rothman) at 35-37, Ex. 68 (expert

---

[6]        KMG contends that the Building's "HVAC system has now been adjusted and Sponsor has had no further complaint from any unit owner about it."  (Defs.' 56.1 Stmt. ¶ 28). This allegedly undisputed fact, however, is not supported by any reference to the record.  (Id.).

report of Peter E. Varsalona ("Varsalona")) at 2, Ex. 70 (deposition of expert Don Erwin) at 110-11)).  The Defendants maintain that to the extent that any construction defects in the 6th Floor Units identified by Waverly's experts in fact exist, they are "minor and readily correct[a]ble at minimal or low cost."[7]  (Varsalona Aff., sworn to Feb. 18, 2011 (ECF No. 117) ("Varsalona Aff."), ¶ 15).

E.      Penthouse

The Penthouse closing initially was scheduled for June 5, 2008, the same day as the closings for the 6th Floor Units.  (Pl.'s 56.1 Stmt. ¶ 48).  KMG did not obtain a TCO for the Penthouse, however, until September 2008.  (Sullivan Decl. Ex. 48).  After two further attempts to close in September, by letter dated December 10, 2008, KMG set a closing date of January 16, 2009.  (Pl.'s 56.1 Stmt. ¶ 50).  On several occasions between September and December 2008, however, Waverly suggested to KMG that it was inappropriate to set a closing date because of myriad construction defects that it alleged were present in the Penthouse and in the Building in general.  (Id. ¶ 52; Sullivan Decl. Exs. 14, 22, 23, 94).

Waverly did not close title to the Penthouse on January 16, 2009.  (See Pl.'s 56.1 Counter-Stmt. ¶ 38).  Accordingly, by letter dated January 20, 2009, KMG informed Waverly that Waverly was "in default" under the terms of the Penthouse purchase agreement, and that it "must cure the Default by closing title to the [Penthouse] on

---

[7]      Tinney, one of Waverly's experts, conceded that there were, to his knowledge, no conditions in the 6th Floor Units that could not be remedied.  (Sullivan Decl. Ex. 32 ("Tinney Dep.") at 192-93; Ex. 65 at 193).

February 26, 2009 . . . TIME BEING OF THE ESSENCE."  (Id. ¶ 67) (block

capitalization in original).  Waverly responded by letter dated February 19, 2009, in

which it reiterated its concerns regarding the Building's HVAC system.  (Sullivan Decl.

Ex. 27).  In that letter, Waverly also informed KMG that, following an upcoming

inspection of the Penthouse, Waverly intended to provide KMG with a detailed list of the

construction deficiencies afflicting the Penthouse.  (Id.).  Waverly further stated that it

would "be prepared to close on or before February 26, 2009, . . . if the penthouse unit is

ready for conveyance by such date in accordance with the NYC Building Code, the

Offering Plan, the Purchase Agreement, and manufacturers' specifications and

recommendations for the equipment installed."  (Id.).

            On February 24, 2009, two days prior to the closing date, Waverly sent

KMG a six-page letter detailing numerous design and construction defects in the

Penthouse identified by its consultants, many of which were alleged to constitute "life-

safety hazards and [Building] Code violations."  (Pl.'s 56.1 Stmt. ¶ 71).  KMG never

responded to that letter.  (Id. ¶ 73).  As a consequence, on the closing date, Waverly

demanded the return of its $2 million deposit for the Penthouse.[8]  (Id. ¶ 75).  Instead of

acceding to this request, KMG canceled the Penthouse purchase agreement and

subsequently sold the Penthouse to another purchaser on February 1, 2010.  (Id. ¶ 82).

---

            [8]      Under the Penthouse purchase agreement, Waverly was required to pay an
"Additional Deposit" of $1 million within seven months of the date it signed the agreement, or
the date that the Plan was declared effective, whichever was later.  (Sullivan Decl. Ex. 2 at
2272).

F.    Procedural History

Waverly commenced this action on April 20, 2009.  (ECF No. 1).
Thereafter, on July 13, 2009, the case was referred to me for general pretrial supervision.
(ECF No. 38).  On July 22, 2009, KMG and its principals, who are also defendants in this
case, filed an answer, in which they counterclaimed against Waverly.  (ECF No. 43).
These defendants allege in their counterclaim that Waverly is liable to them for the cost
of defending this action; they also seek a declaration that KMG may keep Waverly's $2
million in deposits.  (Id.).

After Waverly stipulated to the dismissal of certain defendants, (ECF Nos.
105, 111), Your Honor referred the matter to me for a report and recommendation.  (ECF
No. 112).  The Defendants then moved for summary judgment on February 18, 2011.
(ECF No. 116).  Waverly filed its opposition papers on April 11, 2011, (ECF Nos. 124-
29), and the Defendants filed their reply papers on May 20, 2011, (ECF Nos. 130-31).
The motion therefore is fully submitted.

II.    Standard of Review

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment
is appropriate only when "the movant shows that there is no genuine dispute as to any
material fact" based on supporting materials in the record.  Fed. R. Civ. P. 56.

In deciding a motion for summary judgment, the Court must "view the
evidence in the light most favorable to the party opposing summary judgment and must
draw all permissible inferences" in favor of that party.  Harris v. Provident Life &

Accident Ins. Co., 310 F.3d 73, 78 (2d Cir. 2002); Fischl v. Armitage, 128 F.3d 50, 55 (2d Cir. 1997). The Court also must accept as true the non-moving party's evidence, if supported by affidavits or other evidentiary material. See Beyer v. Cnty. of Nassau, 524 F.3d 160, 164 (2d Cir. 2008). Assessments of credibility, choosing between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the Court. Fischl, 128 F.3d at 55; see also Fed. R. Civ. P. 56(e) 1963 advisory committee's note. Thus, "[t]he court's function is not to resolve disputed issues of fact but only to determine whether there is a genuine issue of material fact to be tried." Fischl, 128 F.3d at 55.

To defeat a motion for summary judgment, however, the non-moving party cannot simply rely upon allegations contained in the pleadings that raise no more than "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Rather, the nonmoving party must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

III. Discussion

A. Damages Claims

In each of its nine causes of action, Waverly seeks unspecified money damages. (Compl. ¶¶ 108, 114, 120, 125, 135, 144, 153, 157, 173). The Defendants contend that they are entitled to summary dismissal of all nine claims because, pursuant to the limitation-on-remedies clause, Waverly "specifically agreed to limit the relief it

would seek in any litigation arising out of the purchase of the Units" to the repair or replacement of the construction defect giving rise to the litigation.  (ECF No. 121 ("Defs.' Mem.") at 16-17; see also Plan at 84).

In response, Waverly cites 430 West 23rd Street Tenants Corporation v. 23rd Associates, 546 N.Y.S.2d 619 (1st Dep't 1989).  In that case, the Appellate Division, First Department allowed the plaintiffs to recover money damages, despite the inclusion in the parties' contract of a limitation-on-remedies clause substantially similar to that contained in the Plan, because "failure by the sponsor to effect repairs, after having a reasonable opportunity to do so, should entitle the purchasers to compensation for the reasonable cost of making the repairs or replacements themselves, and nothing more."  Id. at 620.  The court further noted that such damages "would give the purchasers more than a 'fair quantum of remedy', and likely accords with what the parties intended in the event of a failure by the sponsor to perform."  Id. (quoting Burnell v. Morning Star Homes, Inc., 494 N.Y.S.2d 488 (3d Dep't 1985)).

The court's decision in 430 West 23rd Street is based on the well-established principle that a buyer of goods under a contract governed by the Uniform Commercial Code may escape the restrictions of a limitation-on-remedies clause, and, thus pursue other forms of relief, when the agreed remedy "fails of its essential purpose." See id.; see also Cayuga Harvester, Inc. v. Allis-Chalmers Corp., 465 N.Y.S.2d 606, 612 (4th Dep't 1983).  A seller's inability to effect a successful repair or replacement after numerous attempts may demonstrate such a failure of the restricted remedy's essential

15

purpose.  See Cayuga, 465 N.Y.S.2d at 611 (100 mechanical failures and 100 parts

replacements resulting in 640 hours of down time over eight months); N.Y. Trans Harbor

LLC v. Derecktor Shipyards Conn., LLC, No. 23423/06, 2007 WL 1532293, at *8 (Kings

Cnty. Sup. Ct. May 29, 2007) (citing UCC 2-719(2), which allows other remedies when

"circumstances cause an exclusive or limited remedy to fail of its essential purpose").

   Insofar as Waverly's claims relate to construction defects in the Penthouse,

it is clear that the Plan's limited remedy has failed of its essential purpose.  On February

1, 2010, KMG sold the Penthouse to another buyer.  (Pl.'s 56.1 Stmt. ¶ 82).  Since

Waverly no longer owns the Penthouse, any remediation of the alleged defects in that unit

would not benefit Waverly in any way.  See Cayuga, 465 N.Y.S.2d at 611 (a plaintiff is

permitted to seek other remedies "whenever an exclusive remedy, which may have

appeared fair and reasonable at the inception of the contract, as a result of later

circumstances operates to deprive a party of a substantial benefit of the bargain").

Accordingly, the Plan's limited remedy provision does not bar Waverly's claims for

damages arising out of construction defects in the Penthouse.

   Turning to the 6th Floor Units, "whether circumstances have caused a

'limited remedy to fail of its essential purpose' . . . is a question of fact for the jury and

one necessarily to be resolved upon proof of the circumstances occurring after the

contract is formed."  Id.  Here, Waverly has adduced evidence that, despite the

Defendants' numerous attempts to remedy the HVAC problems in these units, the HVAC

defects persisted, at least as of August 2009.  (See Pl.'s 56.1 Stmt. ¶¶ 34 (in July 2008,

Waverly informed KMG that "the 6th Floor HVAC, even after performance of repair work, was still not working properly"), 45 ("Although Sponsor had repeatedly assured it that the HVAC problems had been remediated, in early October [2008], [Waverly] again notified Sponsor that it was still experiencing HVAC temperature control problems in 6E and 6W and requested repairs."), 81(b) (after extensive building-wide repair efforts, "there were continuing HVAC issues at the Building in August of 2009")).  Although Varsalona, the Defendants' expert, averred that these alleged defects were "minor and readily correct[a]ble," (Varsalona Aff. ¶ 15), and Tinney, Waverly's own expert, testified that the defects in the 6th Floor Units were not beyond repair, (Tinney Dep. 192-93; Sullivan Decl. Ex. 65 at 193), the fact that a defect may be corrected does not compel the conclusion that the Plan's limited remedy provision must be enforced.  In 430 West 23rd Street, for example, the Appellate Division allowed the plaintiffs to recover money damages — not because the defects about which they complained were incurable, but because the sponsor had failed to remedy them.  546 N.Y.S.2d at 619 (plaintiffs are entitled "to compensation for the reasonable cost of making the repairs or replacements themselves") (emphasis added).

In addition, although the Defendants argue that Waverly has "failed to deny, and thus must be deemed to have admitted, that all HVAC issues in the Building have in fact been resolved," (ECF No. 130 ("Reply") at 3 n.3 (citing Defs.' 56.1 Stmt. ¶ 28; Pl.'s 56.1 Counter-Stmt. ¶ 28)), Waverly did, in fact, dispute the Defendants' factual assertions.  In their Rule 56.1 Statement, the Defendants maintain that "building-wide

adjustments to the HVAC system were implemented by Sponsor and completed over the course of several months," and that the "HVAC system has now been adjusted and Sponsor has had no further complaint from any unit owner about it."  (See Defs.' 56.1 Stmt. ¶ 28 (citing ECF No. 120 (Aff. of Andrea L. Roschelle, Esq., sworn to on Feb. 18, 2011 ("Roschelle Aff."), Ex. F))).  As Waverly correctly points out, however, the exhibit upon which the Defendants rely merely states that the Building superintendent confirmed the existence of an HVAC leak in Unit 6W and reported it to "Vanguard Construction." (Roschelle Aff. Ex. F).  Thus, this exhibit "can hardly support the argument that work was 'completed.'"  (Pl.'s 56.1 Counter-Stmt. ¶ 28).  Furthermore, as Waverly also correctly observes, even if the Defendants were able to show that the HVAC system "has now been adjusted," (Defs.' 56.1 Stmt. ¶ 28) (emphasis added), such an assertion would be irrelevant.  (Id.) (emphasis added).  The fact that repairs were effected by 2011, scarcely compels the conclusion, as a matter of law, that a limited remedy agreed to in 2006 had not failed of its essential purpose.

In sum, a genuine issue of fact exists as to whether the Plan's limited remedy of repair and replacement has failed of its essential purpose with respect to the defects in the 6th Floor Units.  The Defendants therefore are not entitled to summary judgment with respect to Waverly's claims for damages arising out of alleged construction defects in these units.[9]

---

[9]      In addition to unspecified money damages, in its three causes of action for fraudulent and/or negligent misrepresentation, Waverly seeks rescission of the Purchase Agreements and return of its deposit for the Penthouse and the full purchase price for the 6th

B.      Breach of Contract Claims

1.      Penthouse

In its first cause of action, Waverly alleges that the Defendants breached the

Penthouse purchase agreement because the Penthouse (a) "was improperly and

inadequately designed and constructed and completed in an incompetent and

unworkmanlike manner," (b) suffered from "material design and construction [d]efects

that violate applicable national, state and local fire prevention and building code

regulations and requirements," (c) was "substantially below applicable prevailing

standards for an upscale, penthouse luxury condominium in Manhattan," and (d) was "not

in accordance with the Plans and Specifications for the Unit, as detailed in the Plan."

(Compl. ¶ 107).  In their counterclaim, certain of the Defendants, in turn, allege that

Waverly breached the Penthouse Agreement by failing to close title to the Penthouse on

February 26, 2009, and that they consequently are entitled to retain Waverly's $2 million

deposit, plus any interest accrued thereon.  (ECF No. 43 at 25-32; Defs.' Mem. at 19-22,

24-25).

Under New York law, a plaintiff alleging the breach of a contract is

required to show:  (a) the existence of an agreement; (b) the plaintiff's adequate

_____

Floor Units.  (Compl. ¶¶ 134, 143, 152).  Although the Defendants characterize this as "damages
in the form of rescission," (Defs.' Mem. at 16), rescission is a form of equitable relief.  See In re
Target Two Assocs., 04 Civ. 8657 (SAS), 2005 WL 1140538, at *4 (S.D.N.Y. May 16, 2005);
Sokolow v. Lacher, 747 N.Y.S.2d 441, 446 (1st Dep't 2002).  Therefore, even if the Plan's
prohibition on suits for money damages arising out of construction defects were applicable to
Waverly's other claims for relief, it would not mandate the dismissal of these three claims.

performance of that agreement; (c) a breach by the defendant; and (d) damages.  See

Williams v. Time Warner Inc., No. 09 Civ. 2962 (RJS), 2010 WL 846970, at *6

(S.D.N.Y. Mar. 6, 2010).  "To satisfy the first element, [a p]laintiff must show "offer,

acceptance, consideration, mutual assent, and intent to be bound."  Id. (quoting

Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 427 (2d Cir. 2004)).

   The Defendants contend that they are entitled to summary judgment on

Waverly's first breach of contract claim because Waverly failed to close title to the

Penthouse, even though, "under the [Penthouse] Agreement and Plan, the issuance of a

TCO for the [Penthouse] Unit was the only prerequisite to closing.  Inasmuch as a TCO

. . . was, in fact, issued . . . plaintiff was duty-bound to close title to the [Penthouse] Unit."

(Defs.' Mem. at 17; see also id. at 19-22).  In other words, the Defendants argue that

Waverly has failed, as a matter of law, to satisfy the second element of a breach of

contract claim — performance of its own contractual obligations.

   In response, Waverly maintains that the procurement of a TCO was a

necessary, but not sufficient, condition to trigger its obligation to close title to the

Penthouse.  In addition to securing a TCO, Waverly asserts that the Plan mandated that

the Penthouse be "substantially completed" before Waverly's duty to close came into

effect.  Thus, in Waverly's view, the issuance of a TCO is not conclusive evidence of

substantial completion.  Waverly argues that, because the Penthouse was not

"substantially completed" as of the closing date due to the presence of "[n]umerous

substantial, material construction defects and life-safety hazards," the Defendants are

liable for breach, and cannot prevail on their breach of contract counterclaim.  (Pl.'s

Mem. at 12-15).

   In support of its position, Waverly relies on the First Department's recent

decision in <u>Asensio v. Casa 74th Development, LLC</u>, 913 N.Y.S.2d 96 (1st Dep't 2010).

In that case, as here, the offering plan provided:

> [I]f Purchaser finds that Sponsor's improvements as described
> in the Plan or in the . . . Agreement . . . <u>have not been fully
> completed, although such improvements have been
> substantially completed</u>, then Sponsor . . . and Purchaser will
> at the time of such execution agree upon and set forth in the
> Inspection Statement a list of the incomplete work to be
> completed by Sponsor following the Closing.

<u>Id.</u> at 98 (Nardelli, J., dissenting) (emphasis added).  In addition, the agreement between

the parties with respect to plaintiff Asensio's purchase of one of the units in the sponsor's

condominium contained language identical to that of the Purchase Agreements in this

case.  <u>See id.</u> at 98-99.  Thus, the sponsor in <u>Asensio</u>, like KMG, argued that "if all other

prerequisites not involving the construction of the Unit are met, Purchaser shall be

obligated to close and complete payment of the full Purchase Price . . . once a Temporary

or Permanent Certificate of Occupancy is issued for the Unit."  <u>Id.</u> at 99.

Notwithstanding this language, however, the Appellate Division concluded that

substantial completion was, in fact, a prerequisite to closing, stating that the "sponsor's

failure to substantially complete the work would have constituted a breach of the

agreement to sell the unit and relieved plaintiff of his duty to attend the closing and tender the balance of the purchase price."[10]  Id. at 97.

The interpretation of a private contract is "ordinarily a question of state law."  Sec. Ins. Co. of Hartford v. TIG Ins. Co., 360 F.3d 322, 326 (2d Cir. 2004) (quoting Volt Info. Scis., Inc. v. Bd. of Trs., 489 U.S. 468, 474 (1989)).  Additionally, a federal court acting under its diversity jurisdiction is bound by the decision of a state intermediate appellate court on a question of state law unless there is "persuasive evidence" that the state's highest court would reach a different conclusion.  10 Ellicott Square Court Corp. v. Mt. Valley Indem. Co., 634 F.3d 112, 120 n.10 (2d Cir. 2010); Entron, Inc. v. Affiliated FM Ins. Co., 749 F.2d 127, 132 (2d Cir. 1984).  The Defendants consequently cannot prevail on Waverly's first breach of contract claim or their own counterclaim unless they can demonstrate that the New York Court of Appeals would interpret the Plan and Purchase Agreements differently than the First Department did in Asensio.

The Defendants attempt to distinguish Asensio by arguing that the buyer and seller in that case had negotiated a rider ("Rider") to the sales agreement "in which the sponsor agreed to deliver the unit with particular improvements complete at closing," and that disputed factual issues "as to whether the negotiated improvements were substantially complete at closing" provided the basis for the court's denial of summary

---

[10]     The plaintiff in Asensio contended, in that regard, that his architect had identified "104 construction defects and incomplete items" during his pre-closing inspection.  Id. at 99.

judgment.[11]  (Reply at 9-10).  Suffice it to say, neither the majority opinion, nor the dissenting opinion in Asensio makes any mention of the Rider.  Thus, the Defendants' suggestion that the decision was premised on the sponsor's failure to complete the work identified in the Rider, as opposed to other work, is sheer speculation.  See 913 N.Y.S.2d at 97.  Moreover, the Rider does not require the additional work set forth therein to be "substantially completed" by the closing date.  (See Schieber Aff. Ex. C).  It follows that the Rider had no bearing on the First Department's conclusion that substantial completion was a prerequisite to closing.

In sum, the Defendants have not shown that the New York Court of Appeals would interpret the language in the Plan and Purchase Agreements in this case differently than the Appellate Division did in Asensio.  Moreover, Waverly has come forward with evidence sufficient to demonstrate that a genuine issue of fact exists as to whether the Penthouse was, in fact, "substantially completed" as of February 26, 2009.  (See Pl.'s 56.1 Stmt. ¶¶ 68, 71-72, 79).  The Defendants' motion for summary judgment dismissing Waverly's first cause of action and granting their counterclaim therefore should be denied.

_____

[11]     The Rider is annexed as Exhibit C to the Affidavit of Evan R. Schieber, Esq., sworn to on May 20, 2011 (ECF No. 131) ("Schieber Aff.").

2.     6th Floor Units

Waverly's second and third causes of action allege that the Defendants breached the purchase agreements relating to the 6th Floor Units because the Units were designed and constructed improperly, in violation of the applicable regulations and prevailing construction standards for luxury condominiums in Manhattan.  (Compl. ¶¶ 113, 119).  The Defendants contend that they are entitled to summary judgment with respect to these claims because of Waverly's failure to comply with the Plan's "strict requirements for serving timely written notice of alleged construction defects . . . , which . . . is a condition precedent to the enforcement of Sponsor's limited warranty of repair." (Defs.' Mem. at 15).  According to the Defendants, Waverly did not notify them of any construction defects in the 6th Floor Units, other than defects pertaining to the HVAC system, until March 2009, at the earliest, which was many months after the period to provide notice of latent or patent defects had expired.  (Id. at 16; Reply at 2-3). Therefore, say the Defendants, Waverly's second and third breach of contract claims must be dismissed to the extent that they are premised on defects unrelated to the HVAC system.

Although the Defendants concede that they had timely notice of the HVAC-related defects, (see Reply at 2-3), they argue that these defects cannot serve as the basis for Waverly's breach of contract claims because (a) KMG "reserved to itself in the Plan the right to make corrections to building-wide systems, such as HVAC, during the first five (5) years of condominium operation," and (b) Waverly "failed to deny, and thus must

24

be deemed to have admitted, that all HVAC issued in the Building have in fact been resolved." (Id. at 3 n.3).

Under New York law, a plaintiff's failure to comply with the notice requirements of a limited warranty clause will result in the summary dismissal of a breach of warranty claim. Pinkus v. V.F. Builders, Inc., 705 N.Y.S.2d 283, 283 (2d Dep't 2000). The same result does not necessarily obtain, however, with respect to a plaintiff's related breach of contract claim. Rather, when a purchase agreement contains a limited warranty provision, as the Plan does here, (see Plan at 82), the plaintiff is precluded from bringing a breach of contract claim only if it is premised entirely on the defendant's alleged breach of the common-law housing merchant implied warranty, pursuant to which the seller represents that the property was constructed in a skillful manner free from material defects. That implied warranty, now codified in GBL § 777-a, see Fumarelli v. Marsam Dev., 92 N.Y.2d 298, 307 (1998), may be excluded by contract pursuant to GBL § 777-b(3), as it was here, as long as the seller offers the buyer a limited warranty that satisfies the requirements of the statute. See GBL § 777-b(4); Gallup v. Summerset Homes, LLC, 920 N.Y.S.2d 504, 507 (4th Dep't 2011); Tiffany at Westbury Condo. v. Marelli Dev. Corp., 840 N.Y.S.2d 74, 77 (2d Dep't 2007); Biancone v. Bossi, 806 N.Y.S.2d 694, 696 (2d Dep't 2005). In other words, a plaintiff's breach of contract claim survives, even if the plaintiff did not adhere to the limited warranty's notice requirements, if the claim alleges that the defendants breached provisions of the contract other than a common law

implied warranty, which was expressly excluded in the limited warranty provision, as GBL § 777-b(3) allows.  Gallup, 920 N.Y.S.2d at 507; Biancone, 806 N.Y.S.2d at 696.

Here, although Waverly asserts that the Defendants breached the Purchase Agreements for the 6th Floor Units by designing, constructing, and completing them in an improper, inadequate, incompetent, and unworkmanlike manner, Waverly also alleges that the units (a) suffered from "construction [d]efects that violate applicable national, state and local fire prevention and building code regulations and requirements," (b) were "substantially below applicable prevailing standards for an upscale, penthouse luxury condominium in Manhattan," and (c) were "not in accordance with the Plans and Specifications . . . detailed in the Plan." (Compl. ¶¶ 113, 119).  Because the latter three bases for Waverly's breach of contract claims do not relate to the housing merchant implied warranty, Waverly may pursue its second and third causes of action despite the Plan's limited warranty provision, except to the extent that they may be based on the common law implied warranty.[12]

That said, Waverly is not yet out of the woods completely with respect to these claims.  Under New York law, in an action for breach of contract arising out of a

---

[12]     In their brief, the Defendants also contend that Waverly's failure to adhere to the limited warranty provision's notice requirements mandates the dismissal of Waverly's fourth, sixth, seventh, and eighth causes of action, which allege negligence, fraudulent and/or negligent misrepresentation, and gross negligence, respectively.  (See Defs.' Mem. at 15).  Since the failure to comply with the Limited Warranty's notice requirements does not sound the death knell for a breach of contract claim, unless it is based exclusively on an alleged breach of the common law implied warranty, there is no reason to conclude that a different result should obtain with respect to any other claims that do not rely solely on the implied warranty.

contract for the sale of real property, upon closing of title to the property and delivery of the deed to the plaintiff, any claims that the plaintiff may have had based on the contract of sale are "extinguished by the doctrine of merger." <u>Rothstein v. Equity Ventures, LLC</u>, 750 N.Y.S.2d 625, 628 (2d Dep't 2002). Under the merger doctrine, "the obligations and provisions of a contract for the sale of land are merged in the deed and, as a result, are extinguished upon the closing of title unless there is a clear intent evidenced by the parties that a particular provision shall survive delivery of the deed." <u>Dourountoudakis v. Alesi</u>, 706 N.Y.S.2d 476, 476 (2d Dep't 2000) (internal quotation marks omitted).

There is no dispute that the parties properly closed title to the 6th Floor Units on June 5, 2008. (Pl.'s 56.1 Counter-Stmt. ¶ 25; <u>see also</u> Plan at 71 (listing "delivery to Purchaser of a bargain and sale deed" as a prerequisite to closing)). Accordingly, Waverly may hold the Defendants liable only if they breached obligations that continued after delivery of the deed. In that regard, the Defendants acknowledge that "Sponsor is duty-bound, <u>post-closing</u>, to correct, repair or replace 'any and all defects relating to construction of the Building, Common Elements, and Units,'" provided that adequate notice of these defects is given. (Reply at 7 (citing Plan at 82)) (emphasis added). Furthermore, as noted previously, the Defendants concede that they were properly made aware of the 6th Floor Units' HVAC-related defects. (<u>See</u> <u>id.</u> at 2-3 ("<u>other than general complaints plaintiff and others made concerning the HVAC system</u>, nothing adduced during discovery demonstrated that plaintiff complied with the Plan's strict conditions precedent or that it notified Sponsor defendants of its defect claims"))

(emphasis added).  Although Waverly contends that the Defendants were "fully apprised of substantial construction issues affecting the [6th] Floor Units," the only timely post-closing notice that they are able to point to relates to "certain HVAC and related defects" in those units.[13]  (Pl.'s Mem. at 22).  It follows that Waverly's second and third causes of action for breach of contract may proceed, but only to the extent that they arise out of the Defendants' failure to correct HVAC-related construction defects in the 6th Floor Units.

    C.    <u>Negligence and Fraud Claims</u>

The Defendants argue that they are entitled to summary judgment on Waverly's negligence, gross negligence, and fraudulent and/or negligent misrepresentation claims (Counts Four through Eight of the Complaint) because these claims are duplicative of Waverly's three breach of contract claims.  (Defs.' Mem. at 22-23).

It is a well-established principle of New York law that a tort claim that merely restates a breach of contract claim cannot stand.  <u>See</u> <u>B&M Linen, Corp. v. Kannegiesser, USA, Corp.</u>, 679 F. Supp. 2d 474, 480 (S.D.N.Y. 2010); <u>Clark-Fitzpatrick v. Long Island R.R. Co.</u>, 70 N.Y.2d 383, 389-90 (1987).  In order to distinguish a tort claim from a breach of contract claim, a plaintiff must "(i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent

---

    [13]    That the Plan provides that "[v]arious systems, including but not limited to water supply, [HVAC] and elevators, may require substantial time after any Closing to complete," does not relieve the Defendants of their obligation to "correct, repair or replace <u>any and all</u> defects relating to construction of the Building, Common Elements, and Units" about which they receive notice.  (Plan at 81-82).

misrepresentation [or other tortious conduct] collateral or extraneous to the contract; or

(iii) seek special damages that are caused by the misrepresentation [or other tortious

conduct] and unrecoverable as contract damages."  Bridgestone/Firestone, Inc. v.

Recovery Credit Servs., Inc., 98 F.3d 13, 20 (2d Cir. 1996) (discussing fraud and breach

of contract claims); Waterville Inv., Inc. v. Homeland Sec. Network, Inc. (NV Corp.), No.

08 Civ. 3433 (JFB) (WDW), 2010 WL 2695287, at *7 (E.D.N.Y. July 2, 2010) ("In

considering negligence claims arising out of a breach of contract, courts have applied the

Bridgestone/Firestone analysis").

   Here, although the Plan obligated the Defendants to comply with "all

applicable regulations of the Building Code of the City of New York," (Plan at 127),

Waverly correctly contends that the Defendants had an independent legal duty "to comply

with the various Codes governing construction of condominium developments in New

York City."  (Pl.'s Mem. at 17-18).  Indeed, even if the Plan and Purchase Agreements

were silent as to compliance with the Building Code, the Defendants nonetheless would

have been bound to adhere to it.  Therefore, because Waverly has demonstrated the

existence of a legal duty to comply with the Building Code separate from its contractual

obligation to do so, the Defendants are not entitled to summary judgment to the extent

that Waverly's claims for negligence, gross negligence, and fraudulent and/or negligent

misrepresentation arise out of the Defendants' alleged failure to adhere to that Code.  See

Great Earth Int'l Franchising Corp. v. Milks Dev., 311 F. Supp. 2d 419, 425-26 (S.D.N.Y.

2004) (fraud claim not duplicative of contract claim where defendant had independent

obligation under regulations to exclude certain ingredients from its products and to label

its products truthfully) (citing <u>Sommer v. Fed. Signal Corp.</u>, 79 N.Y.2d 540 (1992));

<u>Reade v. SL Green Operating P'ship, LP</u>, 817 N.Y.S.2d 230, 231-32 (1st Dep't 2006)

(negligence claim alleging violations of the Building Code and New York State Multiple

Dwelling Law not duplicative of breach of contract claim).

      D.    <u>Martin Act Preclusion</u>

      The Defendants further argue that they are entitled to summary judgment on

Waverly's fifth, sixth, seventh, and ninth causes of action because these claims are

preempted by Article 23-A of the GBL, more commonly known as the "Martin Act."

(Defs.' Mem. at 23).

      In its recent decision in <u>CMMF, LLC v. J.P. Morgan Investment</u>

<u>Management Inc.</u>, the First Department held that common law causes of action are not

precluded by the Martin Act as long as such claims "fit within a cognizable legal theory"

without "rely[ing] entirely on alleged omissions from filings required by the Martin Act"

and the Attorney General's implementing regulations.  915 N.Y.S.2d 2, 5 (1st Dep't

2010).  The Plan and any amendments thereto unquestionably are documents required by

the Martin Act and the regulations promulgated under its authority.  <u>Kerusa Co. LLC v.</u>

<u>W10Z/515 Real Estate Ltd. P'ship</u>, 12 N.Y.3d 236, 244 (2009).  Accordingly, to proceed

with its claims said to arise out of required filings, Waverly must show that it has an

independent basis for recovery.  <u>See</u> <u>Bd. of Mgrs. of Marke Gardens Condo. v. 240/242</u>

<u>Franklin Ave., LLC</u>, 898 N.Y.S.2d 564, 565 (2d Dep't 2010) (fraud claims not barred by

Martin Act where defendant allegedly made misrepresentations "not only in the offering

plan, but in brochures, advertisements, and purchase agreements, as well as oral

statements"). Waverly easily satisfies this test with respect to the first three of the

disputed causes of action.

Waverly bases its fifth cause of action, which accuses the Defendants of

making fraudulent or negligent misrepresentations in connection with the advertising,

marketing, and sale of the Penthouse, not merely on alleged misrepresentations in the

Plan, but also on (a) misrepresentations in emails regarding the condition of the

Building's HVAC system, (Pl.'s 56.1 Stmt. ¶ 36), and (b) the representations that the

Penthouse was fit to be closed, as evidenced by the numerous "Closing Letters" sent by

Defendants to Waverly from May 2008 through January 2009, (Sullivan Decl. Exs. 17-

21).  Accordingly, the Defendants are not entitled to summary judgment as to this claim

on the basis of Martin Act preclusion.

In addition, to support its sixth and seventh causes of action, which allege

that the Defendants made fraudulent or negligent misrepresentations relating to the 6th

Floor Units, Waverly has offered evidence of alleged misrepresentations contained in

emails dated July 23 and August 12, 2008, in which the Defendants asserted that "all

HVAC issues have been resolved" and that "all work necessary to rectify" the leak in 6W

was completed.  (Pl.'s 56.1 Stmt. ¶¶ 36, 39, 42 (citing Sullivan Decl. Exs. 5, 11)).  Since

these alleged misrepresentations were not made in the Plan or the amendments thereto,

the Martin Act does not preempt these causes of action.

Finally, the Court need not determine whether Waverly's ninth cause of action, which arises under Section 349, is precluded by the Martin Act for the reasons set forth below.

E.      Section 349

The Defendants' last contention is that Waverly's claim under Section 349, New York's consumer fraud statute, must be dismissed because KMG's allegedly "deceptive" conduct does not have the requisite impact on consumers at large to establish a cause of action under that statute.  (Defs.' Mem. at 23-24).

To make out a claim under Section 349, a plaintiff must prove, as a threshold matter, that the defendant engaged in "conduct that is consumer oriented." N.Y. Univ. v. Cont'l Ins. Co., 87 N.Y.2d 308, 320 (1995).  "The conduct need not be repetitive or recurring" to be considered consumer-oriented, but the "defendant's acts or practices [nevertheless] must have a broad impact on consumers at large."  Id.  As the Appellate Division, Second Department explained in Teller v. Bill Hayes, Ltd., Section 349 "was primarily intended to apply to more modest [consumer sales] transactions."  630 N.Y.S.2d 769, 773 (2d Dep't 1995).  Indeed, "[t]he typical violation contemplated by the statute involves an individual consumer who falls victim to misrepresentations made by a seller of consumer goods usually by way of false and misleading advertising."  Id. (internal quotation marks omitted).  Accordingly, "large, private, single-shot contractual transactions" plainly fall outside the scope of the statute.  Id. at 773-74 (discussing Genesco Entm't v Koch, 593 F. Supp. 743, 751-52 (S.D.N.Y. 1984), a case involving the

32

contract for the rental of Shea Stadium).  New York courts have split on whether the purchase of a condominium unit is the sort of "consumer-oriented" transaction to which the statute was intended to apply, or more closely resembles the complex, single-shot transactions that fall outside the statute's purview.  Compare Thompson v. Parkchester Apts. Co., 706 N.Y.S.2d 637 (1st Dep't 2000) (in action alleging fraud in connection with the purchase of condominium units, plaintiffs failed to show that alleged deceptive acts, if permitted to continue, would have a broad impact on consumers at large), and Devlin v. 645 First Ave. Manhattan Co., 645 N.Y.S.2d 476 (1st Dep't 1996) (same), with Bd. of Mgrs. of Bayberry Greens Condo. v. Bayberry Greens Assocs., 571 N.Y.S.2d 496 (2d Dep't 1991) (allegations of deceptive practices in the advertisement and sale of condominium units sufficient to state a claim under Section 349).

Although Waverly alleges that KMG "renovated, marketed and sold nineteen separate apartments" and that many of the construction defects about which it complains affected other residents in the building, (Pl.'s Mem. at 24-25), the transactions at issue here are nevertheless "more akin to the large-scale, one-shot kind of transactions to which [Section 349] has generally been held inapplicable."  Teller, 636 N.Y.S.2d at 774.  First, while Waverly asserts that "there is no exception for 'wealthy purchasers' under [Section] 349," (Pl.'s Mem. at 24 n.13), the amount of money involved in the transaction unquestionably is an important factor in the analysis.  As the court in Teller observed, the fact that Section 349 awards the prevailing party the greater of actual damages or $50 and that treble damages awards are capped at $1,000, also weighs against

applying the statute in cases such as this, where millions of dollars are at stake.  636

N.Y.S.2d at 773; see also Genesco, 593 F. Supp. at 752 (Section 349 inapplicable because

of, inter alia, the "large sums of money" involved).

   Additionally, Clark, a successful businessman, is hardly the type of

inexperienced or unsophisticated consumer whom the statute was designed to protect.

See Teller, 636 N.Y.S.2d at 774 ("The statute was intended to empower consumers; to

even the playing field in their disputes with better funded and superiorly situated

fraudulent businesses.  It was not intended to supplant an action to recover damages for

breach of contract between parties to an arm's length contract.").  It also is difficult to

square the notion that this is a "consumer transaction" with the fact that Clark evidently

retained counsel to form a limited liability corporation in Nevada to engage in the

transaction on his behalf.

   Finally, the complex nature of the transactions at issue in this case also tips

the balance in KMG's favor.  Here, as in Quail Ridge Associates v. Chemical Bank, 558

N.Y.S.2d 655 (3d Dep't 1990), the agreements themselves demonstrate the "patently

complex nature of th[ese] multimillion dollar transaction[s]."  Indeed, the Plan, exclusive

of amendments, spans over four hundred pages, while the Purchase Agreements are

likewise lengthy and complicated.

   For these reasons, although KMG's deceptive practices are alleged to

"potentially affect" consumers situated similarly to Waverly, the large amounts of money,

sophistication of the parties, and complexity of the transactions render Section 349 inapposite in this case.

## IV.   Conclusion

For the foregoing reasons, the Defendants' motion for summary judgment, (ECF No. 116), should be granted with respect to Waverly's ninth cause of action, alleging a violation of Section 349, and denied with respect to Waverly's remaining eight claims.

## V.   Notice of Procedure for Filing of Objections to this Report and Recommendation

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure.  See also Fed. R. Civ. P. 6(a) and (d).  Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Victor Marrero, and to the chambers of the undersigned at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b).  Any requests for an extension of time for filing objections must be directed to Judge Marrero. The failure to file these timely objections will result in a waiver of those objections for

purposes of appeal.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas

v. Arn, 474 U.S. 140 (1985).

Dated:          New York, New York
                August 15, 2011

                                                    _____
                                                    FRANK MAAS
                                                    United States Magistrate Judge


Copies to:

Peter A. Sullivan, Esq.
Steven S. DiCesare, Esq.
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004

Andrea L. Roschelle, Esq.
Starr Associates, L.L.P.
245 Fifth Avenue
Suite 1102
New York, New York 10016